UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

HARVINDER S. PUJJI,                    )
                                       )
                    Plaintiff,         )
       v.                              )          No. 4:21-cv-00445-SEP
                                       )
PETE BUTTIGIEG,                        )
                                       )
                    Defendant.         )

## MEMORANDUM AND ORDER

Before the Court is Defendant's Motion for Summary Judgment. Doc. [80]. The motion is fully briefed and ready for disposition. For the reasons set forth below, the motion is denied.

### FACTS AND BACKGROUND[1]

Plaintiff Harvinder Pujji brings this employment discrimination lawsuit against the United States Secretary of the Department of Transportation in his official capacity. After he was terminated from his job as an Aviation Safety Inspector (ASI) for the Federal Aviation Administration's (FAA) St. Louis Flight Standards District Office (FSDO), Plaintiff filed an amended complaint alleging violations of his rights under Title VII of the Civil Rights Act of 1964. Doc. [6]. Plaintiff alleges that Defendant (1) discriminated against him based on his race, religion, and national origin; (2) retaliated against him for engaging in protected activity; and (3) created a hostile work environment.[2] *Id.*

Plaintiff was born in India and became a naturalized American citizen in 2008. Doc. [100] at 57-58. As a practicing Sikh, he wears a beard and traditional turban headwear. *Id.* at 57. In the summer of 2001, Plaintiff accepted a position with the FAA's St. Louis FSDO, and he began working for the FAA two days before the September 11, 2001, terrorist attacks. *Id.* at 59. In April 2002, Plaintiff was terminated and was told that his termination was because he was not an American citizen. *Id.* at 59. Plaintiff initiated an administrative proceeding, asserting that his termination was discriminatory. *Id.* at 60. In January 2003, the dispute was resolved when the

---

[1] Unless otherwise noted, the facts in this section are not disputed.

[2] Plaintiff voluntarily dismissed claims of age and disability discrimination. *See* Doc. [97] at 8 n.1.

FAA agreed to allow Plaintiff to return to work at the agency as a contract employee for three years, after which he left the FAA to work in the private sector. *Id.* at 60.

Plaintiff returned to work for the FAA's St. Louis FSDO in June 2014. *Id.* at 61. In September 2014, Plaintiff received an anonymous letter that was addressed to his supervisor, Front Line Manager (FLM) Joel Pettus. *Id.* at 61-62. The anonymous letter referred to Plaintiff in derogatory terms such as "Mr. Turban head" and warned FLM Pettus to "WATCH THE TURBAN." *Id.* at 62. Plaintiff gave the anonymous letter to Pettus, who sent it to the FAA's human resources (HR) department *Id.* at 63. When Plaintiff was interviewed about the anonymous letter by a special agent, the questions gave him the impression that he was under investigation, but Defendant denies that the questions targeted Plaintiff. *Id.* at 63. The FAA's records do not reveal how or whether it investigated the anonymous letter, how it determined that it could not identify the author, or whether any remedial action was taken. *Id.* at 64. In January 2017, when Plaintiff submitted a hostile work environment complaint—which included an allegation that management failed to act appropriately in response to the anonymous letter—the HR department's official investigation report stated that Plaintiff "should have been informed of the outcome and closure of [the investigation of the anonymous letter], which may or may not have been done." *Id.*

Plaintiff testified that FAA employees repeatedly referred to him as "turban head" and commented daily that they could obtain more "turban time" by flying with Plaintiff.[3] *Id.* at 66; Doc. [82-2] at 39. In aviation, "turbine" is pronounced the same as "turban," and "turbine time" is an important metric that measures the number of hours an aviator has flown an aircraft with a turbine-powered engine. *Id.* at 66. Aviators have to accrue turbine time to earn the certification required to independently operate aircraft with turbine-powered engines. *Id.* In many companies, turbine time is critical to getting promoted. *Id.* at 5. When asked in his deposition whether he complained to anyone about the "turban time" comments, Plaintiff responded that, after the FAA's apparent failure to investigate the anonymous letter, he "felt there's no use in

---

[3] Defendant denies that FAA employees "routinely" called Plaintiff "turban head" and remarked "on a daily basis" that they could earn more "turban time" by flying with him, noting that "Pujji's self-serving testimony" is the only evidence supporting those claims. Doc. [100] at 66. But Defendant admits that Plaintiff received the September 2014 anonymous letter. *Id.* at 7. And Defendant admits that, on separate occasions in 2017 and 2018, two different FAA employees referred to "Pujji's turban and both instances were reported to the Accountability Board." *Id.* at 66.

complaining" because it would "not . . . get [him] anything. . . . And if [he] start[ed] objecting to these kind[s] of things, it w[ould] create more waves and more problems for [him]." *Id.* at 64; Doc. [82-2] at 39.[4]

When FLM Pettus was his supervisor between May 2014 and May 2016, Plaintiff received positive performance reviews. Doc. [100] at 61, 69-70. Plaintiff also received annual pay raises throughout his tenure at the FAA, each of which stated that his "work performance [wa]s at an acceptable level of competence." *Id.* In December 2015, Plaintiff attended a conference during which a senior FAA official encouraged operations inspectors to conduct flight reviews in their private capacity for other aviators. *Id.* at 74. Based on that guidance, Plaintiff conducted a flight review without compensation for another member of the St. Louis aviation community in June 2016. *Id.*

In May 2016, Lawrence Sadowski became a permanent Front Line Manager and Plaintiff's primary supervisor. *Id.* at 61. Plaintiff testified that employees joked about building "turban time" by flying with him in front of Sadowski multiple times.[5] *Id.* at 66; Doc. [82-1] at 27. On October 17, 2016, Sadowski marked several aspects of Plaintiff's performance as deficient for the first time and sent Plaintiff a Letter of Expectation asserting that his technical performance was deficient. Doc. [100] at 70. In the Letter of Expectation, Sadowski listed the following examples of alleged failures in Plaintiff's work product: spelling and grammatical errors, two pages missing from a questionnaire, a checkbox that was marked incorrectly, using the word "accepted" in a letter instead of "approved," and not citing authority in a letter granting temporary approval for contract training. Doc. [82-14] at 2. Sadowski stated that he would retain a copy of the Letter of Expectation "for a period of one year." *Id.*

During his deposition, Plaintiff stated that Sadowski discriminated against him by singling him out for everything, and "nobody else got the same treatment as [he] did." Doc. [82-2] at 16-17. G.R., another ASI who reported to Sadowski, made grammatical and typographical errors in his work product, but he was not disciplined for those errors. Doc. [100] at 71; Doc. [82-5] at 29-30 (Sadowski stating that he did not discipline G.R. for mistakes such as

---

[4] The Court refers to the CM/ECF pagination in this Memorandum and Order.

[5] Defendant denies that employees made such jokes in front of Sadowski on multiple occasions, noting the lack of any evidence other than Plaintiff's testimony and pointing to Sadowski's testimony to the contrary. Doc. [100] at 66.

typographical errors and omitting necessary information); Doc. [88-4] at 15 (G.R.'s May 16, 2017 Logbook entry containing multiple typographical errors and failing to include necessary information regarding the aircraft's weight); Doc. [88-5] at 2 (G.R.'s October 20, 2017, report containing multiple typographical errors). At weekly team meetings in which the employees discussed their red-lined work product, Plaintiff observed Sadowski call out other employees' errors and give them opportunities to correct the errors without additional consequences. Doc. [100] at 72. Sadowski copied all of Plaintiff's red-lined work product and kept the copies in a file.[6] *Id.*; Doc. [90-6] at 4 (Sadowski stating that he "ha[d] kept copies of documents showing [Plaintiff's] poor level of work").

In April 2017, Sadowski wrote in a letter of recommendation that Plaintiff "is a very friendly, well-spoken professional. He is also very reliable and dependable." Doc. [100] at 73. Sadowski also stated that Plaintiff "may have supervisory and managerial potential." *Id.*

On July 31, 2017, Sadowski emailed Gail Sankey in HR, asking what the process was for placing Plaintiff on an Opportunity to Demonstrate Performance (ODP).[7] *Id.* at 77; Doc. [90-6] at 3-4. The Office Manager of the St. Louis FSDP, Guillermo Heredia, was copied on the email. Doc. [90-6] at 3. Sadowski claimed that he had seen only minimal improvement in Plaintiff's work product after the October 2016 Letter of Expectation. *Id.* He noted he had "documented this in [Plaintiff's Performance Management System] and also ha[d] kept copies of documents showing the poor level of work." *Id.* at 4. HR Specialist Jeffrey Duce responded that employees must be put on notice before they can be considered for an ODP, but that the October 2016 Letter of Expectation would be sufficient because they were within the same fiscal year as the Letter of Expectation. *Id.* at 3-4. Duce noted, "The problem one might ask is if [Plaintiff] was failing in October of last year[,] why has management allowed him to continue to fail for 10 months??" *Id.* at 4. He then listed the information he needed to draft an ODP for Plaintiff, *id.*,

---

[6] Defendant denies that Plaintiff was disciplined for making grammatical and typographical errors and maintains that Plaintiff did not provide evidence that G.R. committed the same or similar errors as Plaintiff on a consistent basis. Doc. [100] at 71-72.

[7] The parties dispute the nature and purpose of an ODP. Doc. [100] at 77. Plaintiff asserts that an ODP is a component of the FAA's progressive disciplinary program, whereas Defendant denies that an ODP is disciplinary. *Id.* Defendant admits, however, that failing an ODP can lead to discipline, including reassignment, demotion, and removal from federal service. *Id.*

and on August 21, 2017, Sadowski sent Sankey and Duce the requested information.  Doc. [82-16] at 1-2.

On August 8, 2017, during an office-wide meeting about "allowable facial hair and enroute policies at air carriers," ASI David Tull said to the crowd, "Harry, you could just rent out your turban."  Doc. [100] at 67.  After an employee reported Tull's comment, the FAA's Accountability Board determined that the comment fell outside of its scope and declined to discipline Tull.  *Id.*

On October 12, 2017, FLM Sadowski sent Plaintiff a Proposed Removal Notice stating that in July 2017, he had learned of Plaintiff's June 2016 flight review.  *Id.* at 74.  In the Proposed Removal Notice, Sadowski claimed that Plaintiff's June 2016 flight review created an appearance of a conflict of interest and was grounds for termination.  *Id.*  Ten days later, another FAA employee, Robert Linenweber, sent an email to a senior FAA official, Central Regional Administrator Joseph Miniace, asking Miniace to intervene on Plaintiff's behalf and prevent his termination.  *Id.* at 75; Doc. [90-25] at 2 ("Urgent Request for Intervention to Prevent a Horrible Injustice to an FAA Inspector").  Linenweber stated that since Plaintiff joined the FAA, his "Sikh dress has caused him to be singled out for discrimination," and his "proposed firing is just one more such event."  Doc. [90-25] at 3.  Linenweber explained that he believed the proposed termination was discriminatory because the FAA endorsed a program allowing aviators to request flights with inspectors; a senior FAA official had given a presentation encouraging Plaintiff and other inspectors to conduct flight reviews outside of their duty hours to stay current on their training; and many inspectors conduct flight reviews outside of their duty hours.[8]  *Id.* at 3-4.  Linenweber continued, "Because of the discrimination Inspector Pujji had been subjected to in the St. Louis office, he searched to find a position in an office where he could be treated fairly" and found such a position that was also a promotion, but "[c]losely following his FLM's learning of Inspector Pujji's selection for the position, the notice of proposed termination was issued."  *Id.* at 4.  "In doing so," Linenweber said, "the FLM blocked Inspector Pujji's promotion and escape from his current hostile environment."  *Id.*  Miniace responded that, as a result of

---

[8] Defendant admits that FAA inspectors were allowed to conduct flight reviews in their private capacity but notes that Linenweber's email was silent on whether Plaintiff was authorized to do so without prior approval and that Plaintiff did not claim to have requested authorization.  Doc. [100] at 75.  Notably, in the Proposed Removal Notice, Sadowski cited only the fact that Plaintiff conducted the June 2016 review, which Defendant now admits was permissible—not the lack of prior approval.  Doc. [82-17] at 1-3.

Linenweber's email, he had contacted the St. Louis FSDO about Plaintiff's case and would continue to monitor the outcome.  Doc. [100] at 75.

On December 1, 2017, Plaintiff filed a complaint with the FAA's Office of Civil Rights, asserting that his proposed removal was wrongful and discriminatory.  *Id.* at 76.  Plaintiff's complaint was referred to mediation, which was scheduled for February 2, 2018, and Wayne Fry, the Division Manager of the St. Louis FSDO and several other regional FSDOs, was assigned to act as the FAA's representative at the mediation.  *Id.*  On January 16, 2018, Sadowski sent Plaintiff a Decision on the October 12, 2017, Proposed Removal Notice, finding that the proposed removal should be reduced to a 30-day suspension from January 28 until February 26, 2018.  Doc. [82-19].  Sadowski confirmed in his deposition that he was aware that Plaintiff was involved in a mediation related to his discrimination complaint.  Doc. [82-5] at 44. On January 26, 2018, exactly one week before the February 2, 2018, mediation, Sadowski sent a follow-up email to HR asking about his July 2017 request to place Plaintiff on an ODP.  Doc. [82-16] at 1.  On February 1, 2018—the day before the mediation was scheduled to take place—Fry met with Sadowski and Heredia to discuss "issues regarding Mr. Pujji." Doc. [100] at 76.  During the February 1st meeting, Fry told Sadowski and Heredia that he wanted Plaintiff to be "put on an ODP as soon as possible."  *Id.*; Doc. [82-16] at 1.  Fry stated in his deposition that "we [referring to himself, Heredia, and Sadowski] made the decision to put [Plaintiff] on ODP.  And then we also talked about the best way to make sure it was fair."  Doc. [82-3] at 8. Fry continued that "part of the discussion was the best way to do that was to not have [Sadowski] manage the ODP because there had been some challenges there."  *Id.*; Doc. [82-5] at 37 (Sadowski recounting that Heredia related to him that the ODP "should be done by a different [Front Line Manager] because Mr. Pujji had expressed feelings that . . . I was singling him out"). Fry said that "we needed to help [Plaintiff] as much as we could and put him on an ODP to help him improve his performance," claiming that an ODP is "a structured process to help the person improve and get back up to the appropriate level of performance so they can be successful. That's our goal."  Doc. [82-3] at 8, 19.

During the February 2, 2018, mediation, Fry offered to reduce Plaintiff's suspension from 30 days to 20 days and informed him that he would be placed on an ODP for 90 days.  Doc. [100] at 77.  If Plaintiff successfully completed the ODP, then Fry said that he would be allowed to take a position in Scottsdale, Arizona.  *Id.*; Doc. [82-2] at 14-15; Doc. [82-41] at 1 (Plaintiff

6

stating that his ODP was suggested by Fry "when [he] refused to accept [Fry's] proposal during the mediation. [Fry's] proposal was that [Plaintiff] would take [his] complaint back and [Fry] w[ould] reduce [his] suspension to 20 days and an ODP of 90 days, at which time [Plaintiff] would be able to go to Scottsdale.") Plaintiff declined Fry's offer. Doc. [82-2] at 15.

On March 8, 2018, Fry responded by email to an inquiry from Senator Roy Blunt: "After receiving the Proposal to Remove him from Federal Service, Mr. Pujji responded. Upon review of his Response, management determined that a 30-day suspension would be the appropriate action. Mr. Pujji is currently serving that suspension, and returns to work shortly." Doc. [100] at 22; Doc. [82-21] at 1. Fry explained that Plaintiff had "filed an EEO complaint that went through the informal stage of Mediation on February 2nd. I was the FAA representative. The Mediation was not successful, (Mr. Pujji declined our offer) so that case has moved to the next phase." Doc. [100] at 23. Fry said that "[u]pon his return to work, Mr. Pujji will be placed on an [ODP] due to his substandard Performance Management System (PMS) final rating" and explained that "[w]e have determined that the ODP will be administered by a Front Line Manager . . . other than Mr. Pujji's current FLM, due to the challenging nature of their relationship." Id. Finally, Fry stated that "last year, as the Agency was finalizing its efforts to remove Mr. Pujji from Federal Service, he received an offer for an FG-1825-14 position in Scottsdale. This was a promotion . . . . At my direction, the offer was rescinded." Id. at 24.

On March 16, 2018, pursuant to Fry's instruction, FLM Sadowski sent Plaintiff a letter notifying him that he would be placed on an ODP from March 19, 2018, until June 16, 2018. Id. at 78-79. The ODP letter referenced only the "Technical Administration" element of Plaintiff's job, which related to the completeness and accuracy of his written reporting. Id. at 78. The timing of the ODP was inconsistent with the FAA's standard practice because Sadowski had issued the Letter of Expectation in October 2016, and an ODP is typically delivered during the same fiscal year that the employee receives notice. Id. at 77-78; see also Doc. [82-13] at 1 (performance cycle was "10/01/2016 to 09/30/2017").

The ODP was administered by Front Line Manager Jason McCoy, who ordinarily managed a different unit within the St. Louis FSDO. Doc. [100] at 21, 79. FLM Robert Lowery, formerly Robert Spahr, briefly administered Plaintiff's ODP plan when McCoy was on leave. Id. at 79, 84. Although inspectors typically gave their work product to support staff to review it for clerical errors before submitting it to their supervisors, Plaintiff was required to submit his

7

work product directly to FLM McCoy during his ODP, and Plaintiff was given no explanation for this change. *Id.* at 79. During required weekly meetings, Plaintiff claims that he asked McCoy for guidance as to how to address concerns about his work product, and McCoy said that he was "not going to help [Plaintiff]" and that he should "figure it out."[9] *Id.* at 80-81; Doc. [82-2] at 20, 21, 36. Plaintiff also claims that McCoy told him that his "Indian English is not going to work here" at the FAA. Doc. [100] at 79-80; *see also* Doc. [82-6] at 18 (McCoy admitting that he "may have used the term Indian English").

On May 8, 2018, during Plaintiff's ODP, FLM Lowery spoke with Heredia about Plaintiff. Doc. [100] at 83. When Lowery told Heredia that he had heard Plaintiff had been diagnosed with a brain tumor, Heredia said "something like that it put a wrench in or derailed his plans." *Id.* Heredia then stated that "it was probably because he wears that turban on his head that he has a brain tumor." *Id.* Lowery reported the incident to HR the following day. *Id.* at 84. Lowery told the Accountability Board that Heredia frequently "use[d] foul language" and referred to other FAA employees using derogatory terms that would make his "skin crawl." *Id.* at 85. Lowery characterized Heredia as "a walking HR/EEO complaint waiting to happen" and said that Heredia "doesn't get it. He thinks he can say anything, like it is a good old boys club." *Id.* at 85-86; Doc. [88-3]. Lowery added that he knew Plaintiff had "filed an EEO complaint[,] and if [Plaintiff] knew about [Heredia]'s comment, we would have a hard time defending this case."[10] Doc. [88-3]. In his deposition, Heredia stated that he did not think what he had said was "really that bad" because he was "talking about [Plaintiff's] headgear and curious being that is the first time that I heard that he had a tumor. I was wondering if the hat would—I know nothing. I'm not a medical doctor. . . . It was a question that was asked." Doc. [82-4] at 16-17. Heredia claimed that he was merely asking, "Would the turban have any effect on his tumor[?]"

---

[9] Defendant denies that McCoy rebuffed Plaintiff's requests for guidance, asserting that Plaintiff "provides no material evidence of these facts other than his self-serving testimony." Doc. [100] at 80-81. When asked in his deposition whether he "attempt[ed] to assist Mr. Pujji in improving his performance" during the ODP, McCoy said that he provided feedback on the files Plaintiff presented and that "it was [his] understanding that at that point in time . . . he was not there for training, but he was there to demonstrate that he could perform." Doc. [82-6] at 22.

[10] In his May 2018 interview statement, Lowery said that he was concerned that Heredia might retaliate against him. Doc. [88-3]. Later, in his deposition, FLM Lowery stated his belief that Heredia had, in fact, retaliated against him because the last rating Heredia gave him was lower than usual, and Lowery successfully challenged the low rating. Doc. [82-7] at 15-16.

*Id.* at 19.  The FAA did not advise Plaintiff of Heredia's comment during or after his ODP.  Doc. [100] at 86-87.

During Plaintiff's ODP, McCoy sent him monthly written reviews by email, copying Sadowski and Lowery.  Docs. [82-24], [82-27], [82-33].  McCoy's emails listed alleged flaws in Plaintiff's work product, most of which were typographical errors, grammatical errors, and formatting issues.  Docs. [82-24], [82-27], [82-33].  All of McCoy's written reviews themselves contained multiple typographical errors.  Docs. [82-24], [82-27], [82-33].  On June 26, 2018, after Plaintiff completed his ODP, McCoy sent an email to Sadowski and Heredia summarizing his opinion of Plaintiff's performance.  Doc. [100] at 81.  McCoy asserted that 14 of Plaintiff's files were sampled during his ODP plan and that 11 of those 14 departed from the agency's guidance, resulting in a 78.5% failure rate.  *Id.*  McCoy also claimed that "there were numerous grammatical and spelling errors that had to be corrected throughout the [ODP] period."  Doc. [82-34] at 1.  McCoy's June 26th email also contained multiple typographical errors, including a misspelling of Plaintiff's name.  Doc. [82-34] at 1.

On July 6, 2018, Fry issued Heredia a Proposed Suspension of 14 days for his comment about Plaintiff's turban.  Doc. [100] at 42.  On September 13, 2018, Fry issued Heredia a Decision on the Proposed 14-Day Suspension, reducing the suspension to 10 days, from September 17th through the 26th.  *Id.* at 44.  During Heredia's suspension, Plaintiff learned about the comment from his co-workers.  *Id.* at 86-87; Doc. [82-2] at 39.  Upon hearing about it, Plaintiff said he "felt miserable . . . [He] thought this was happening and [he] kn[e]w this [wa]s happening and now with the . . . proof right in [his] face, yes, this has happened."  Doc. [82-2] at 40.  Despite the suspension, Heredia remained involved in the decision-making process leading to Plaintiff's termination.[11]  Doc. [100] at 86.

Plaintiff testified that he felt he was in a "living hell" during his time working at the St. Louis FSDO; he chose the early morning shift to avoid interacting with his co-workers; his "hypertension ran up";  his other illnesses "had inflamed at the same time because [he] was not

---

[11] While Defendant does not dispute that Heredia was involved in the decision-making process leading to Plaintiff's termination, he does dispute *how* involved Heredia was.  Doc. [100] at 86.  Citing Heredia's deposition, Defendant asserts that Heredia was merely kept informed of the process leading to Plaintiff's termination and did not monitor Plaintiff's ODP or recommend terminating him.  *Id.*; Doc. [82-4] at 31.  Citing Fry's deposition, Plaintiff counters that Heredia was meaningfully involved in the decision-making process leading to his termination.  Doc. [100] at 86; Doc. [82-3] at 15 (Fry stating that "Mr. Heredia, working with Mr. Sadowski," made the ultimate decision to issue the notice of removal).

eating right"; and his "kidney functions failed drastically." Doc. [82-2] *Id.* at 40-41; Doc. [100] at 68.

On August 29, 2018, Sadowski issued a Notification of Unacceptable Performance that incorporated language from McCoy's June 26th email. Doc. [100] at 81. In it, Sadowski stated that Plaintiff had "failed to meet the expectations for Critical Element #1 – Technical Administration" during his ODP. *Id.* at 42-43. Sadowski also said that he had "no confidence in [Plaintiff's] ability to perform at an acceptable level" and would "be notifying [Plaintiff] soon, in a separate letter, concerning resulting consequences from . . having failed [his] ODP." *Id.* at 43.

On October 18, 2018, Fry was notified that Plaintiff had entered into the informal EEO process by filing another internal complaint alleging that the August 29th Notification of Unacceptable Performance was discriminatory. Doc. [100] at 45; Doc. [82-39] at 4. Fry was assigned to be the "Management Official Primary, who ha[d] authority to provide a possible resolution" during the EEO process, and Heredia was assigned to be the Responsible Management Official. Doc. [100] at 45; Doc. [82-39] at 1. On November 8, 2018, Sadowski sent Plaintiff a Proposed Removal Notice from the FAA based on his failure to successfully complete his ODP. Doc. [100] at 81-82.

Plaintiff responded to the November 8, 2018, Proposed Removal Notice and the March 16, 2018, ODP letter, stating that the ODP was not based on his performance. *Id.* at 82; Doc. [82-41] at 1. Plaintiff asserted that Fry had suggested placing him on an ODP in retaliation for "refus[ing] to accept his proposal during the mediation." Doc. [82-41] at 1. Plaintiff also stated that, "when the ODP was put in place, [he] was moved under the supervision of Mr. Jason McCoy, who in the past has openly shown a dislike for [him] and those of [his] ethnic origin." *Id.* (reporting that McCoy had "told [Plaintiff] to [his] face to keep [his] distance from [him] because he was offended by [his] body odor"). And he reported that McCoy had subjected him to discriminatory conduct during the ODP. *Id.* Later, Sadowski said in his deposition that he could not recall speaking to McCoy or otherwise acting on Plaintiff's allegations concerning McCoy. Doc. [100] at 82. On April 11, 2019, Sadowski issued a Decision on the November 8, 2018, Proposed Removal Notice, informing Plaintiff that he had been removed from his position with the FAA. *Id.* at 83.

In November and December 2019, the FAA investigated Plaintiff's EEO complaints and interviewed Plaintiff, FLMs Sadowski and McCoy, and Aviation Safety Assistant (ASA) Jeremy

10

King.  Doc. [90-19] at 2-5.  In an affidavit, King stated that he was aware of Plaintiff's EEO complaint and that he had assisted Plaintiff in filing it.  Doc. [90-24] ¶ 6.  King said that he had "worked a lot with Mr. Pujji[,] and his performance was excellent."  *Id.* ¶ 9.  He recalled that the only result of Plaintiff notifying management about the 2014 anonymous letter was that "management was out to get him.  Mr. Sadowski picked on everything Mr. Pujji did while making exceptions for Mr. Pujji's coworkers."  *Id.*  King stated that "Mr. Sadowski did everything he could to get rid of Mr. Pujji; it was a 'witch hunt.'"  *Id.*  King explained that support staff ordinarily reviewed an inspector's work product before sending it to a supervisor, but during Plaintiff's ODP, "management grabbed the files before [support staff] completed her job and/or [support staff] was doing a very poor job."  *Id.*  King said, "Management used Mr. Pujji's performance as reason for his termination. . . . [T]his was not reasonable.  Mr. Pujji had great performance."  *Id.* ¶ 18.  King confirmed he believed that Plaintiff was subjected to discrimination and harassment because of his race, national origin, disability, or prior EEO activity and that "[w]hen these things came into play or to question[,] the agency stepped up the pressure on Mr. Pujji."  *Id.* at 5.  In the FAA's report on the investigation into Plaintiff's 2019 EEO complaints, the investigator stated that "[p]er Lawrence Sadowski and concurred by Rhonda Frazier, Management and Program Analyst, no other employees have been terminated for the same or similar charges by Mr. Sadowski."  Doc. [90-19] at 13.

### LEGAL STANDARD

A court must grant a motion for summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.  Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323 (quotation marks omitted).  The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'"  *Farver*

*v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008)).  The evidence must be viewed "in the light most favorable to, and making all reasonable inferences for, the nonmoving party." *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 404 (8th Cir. 2013).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  "'If reasonable minds could differ as to the import of the evidence,' summary judgment is inappropriate." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996) (quoting *Anderson*, 477 U.S. at 256).

DISCUSSION

**I.     Title VII Discrimination Based on Race, Religion, and National Origin**

Defendant argues that he is entitled to summary judgment because Plaintiff cannot establish a prima facie case of discrimination under the *McDonnell Douglas* framework.  Doc. [84] at 7-13 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  According to Defendant, being placed on an ODP does not qualify as an adverse employment action, and Plaintiff has not provided evidence that gives rise to an inference of discrimination.[12]  *Id.* Plaintiff counters that he has presented direct evidence that discrimination was a motivating factor in the decisional process that led to his termination, and so he does not have to satisfy the *McDonnell Douglas* standard.  Doc. [97] at 19-23.  The Court agrees with Plaintiff.

A plaintiff alleging intentional discrimination may survive summary judgment by *either* (1) presenting direct evidence that an illegal criterion was a motivating factor in the disputed employment decision *or* (2) creating an inference of discrimination under the *McDonnell Douglas* burden-shifting framework.  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 (8th Cir. 2010) (citing *McDonnell Douglas*, 411 U.S. at 802-04).  "*Price Waterhouse* defined the term 'direct evidence' negatively to exclude 'stray remarks in the workplace,' 'statements by

---

[12] Defendant asserts that Plaintiff does not claim his termination was discriminatory, but the record belies that assertion.  *See, e.g.*, Doc. [6] at 4 (indicating in the Amended Complaint that the challenged conduct in this lawsuit involves his termination, retaliation, and harassment); Doc. [82-1] at 28 (Plaintiff stating that the "[t]ermination was based on ODP.  But ODP was started—put on throughout, all this thing was discriminatory."); Doc. [82-2] at 25 (Plaintiff stating that he believed that his removal "was not appropriate" and "not right"); Doc. [90-4] (Plaintiff declaring that by testifying during the first deposition that "the entire process that led to [his] termination was discriminatory, . . . [he] did not intend to suggest that the ultimate decision to terminate [him] was not discriminatory as well").

nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'" *King v. Hardesty*, 517 F.3d 1049, 1058 (8th Cir. 2008) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).

"'Direct evidence' has been interpreted as 'conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to find that that attitude was more likely than not a motivating factor in the employer's decision.'" *Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 634 (8th Cir. 1998) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)); *King*, 517 F.3d at 1058 ("[D]irect evidence within the meaning of *Price Waterhouse* may include 'evidence of actions or remarks of the employer that reflect a discriminatory attitude,' 'comments which demonstrate a discriminatory animus in the decisional process,' or comments 'uttered by individuals closely involved in employment decisions.'" (quoting *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991))). "'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). "Courts look beyond the moment a decision was made in order to determine whether statements or comments made by other managerial employees played a role in the ultimate decisionmaking process." *Gagnon v. Sprint Corp.*, 284 F.3d 839, 848 (8th Cir. 2002), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 95 (2003).

If the plaintiff produces evidence sufficient to permit a factfinder to find that discriminatory animus was more likely than not a motivating factor in the employer's decision, "the plaintiff is relieved of the ultimate burden of persuasion and the so-called 'mixed motive' analysis is applied. *Mohr v. Dustrol, Inc.*, 306 F.3d 636, 640 (8th Cir. 2002) (comments by a supervisor not "officially responsible" for hiring were direct evidence where supervisor played a "pivotal role" in hiring and officials deferred to his hiring decision), *abrogated on other grounds by Desert Palace*, 539 U.S. at 95. "Under the mixed motive analysis, 'once the plaintiff persuades a factfinder that, more likely than not, discrimination was 'a motivating part in an employment decision,' the burden shifts to the employer to prove that the employment decision would nevertheless have been made for legitimate, nondiscriminatory reasons.'" *Mohr*, 306 F.3d at 640 (quoting *Yates v. McDonnell Douglas*, 255 F.3d 546, 548 (8th Cir. 2001)). "At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful

13

discrimination was *a* motivating factor in the defendant's adverse employment action.  If so, the presence of additional legitimate motives will not entitle the defendant to summary judgment." *Griffith*, 387 F.3d at 735.  "Therefore, evidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues."  *Id.*; *see also Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir. 2005) (same).

Courts often observe that "direct evidence of discrimination is rare."  *E.E.O.C. v. Liberal R-II Sch. Dist.*, 314 F.3d 920, 923 (8th Cir. 2002).  And the Eighth Circuit "has expounded on this observation by explaining that '[t]here will seldom be eyewitness testimony as to the employer's mental processes' because a shrewd employer will not leave a trail of direct inculpatory evidence for the plaintiff to bring into court."  *Id.* (alteration in original) (quoting *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir. 1996)).  After careful review of the record, the Court finds that this is one of the rare cases where there is "strong (direct) evidence" that discrimination was a motivating factor in the employer's adverse employment action. *Griffith*, 387 F.3d at 736 (plaintiff in such a case "does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial").

Plaintiff has presented uncontroverted evidence of his supervisor's statements reflecting discriminatory animus in the decision process.  For example, McCoy's statement to Plaintiff that "Indian English is not going to work here" while administering Plaintiff's ODP warrants an inference of discriminatory animus sufficient to permit the factfinder to conclude that an illegitimate criterion was a motivating factor in the decision to terminate Plaintiff.  *See Browning*, 139 F.3d at 635 (supervisor's "reference to [plaintiff] as 'that white boy' in the context of [plaintiff]'s employment warrant[ed] an inference of discriminatory attitude sufficient to permit the factfinder to conclude that race was a motivating factor in the decision to terminate [plaintiff]"); *King*, 517 F.3d at 1058-59 (decision-maker's statement "that 'white people teach black kids . . . better than someone from their own race' is evidence that may be viewed as directly reflecting [the decision-maker's] alleged discriminatory attitude"); Doc. [100] at 79-80. Likewise, Heredia's statements that Plaintiff's brain tumor "put a wrench in or derailed his plans" and that "it was probably because he wears that turban on his head that he has a brain tumor," also made during Plaintiff's ODP and in the context of his employment, "reveal[] 'a decidedly negative attitude toward [Sikh] people on the part of [a person] responsible for [the

14

employment decision].'" *See Browning*, 139 F.3d at 635 (quoting *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924 n.6 (11th Cir. 1990)); Doc. [100] at 83; *see also Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991) (direct evidence of discrimination may include an employer's actions or remarks that reflect a discriminatory attitude).

Defendant admits that McCoy and Heredia made the above statements but argues that they do not constitute direct evidence of discrimination in the decision-making process that led to Plaintiff's termination because Sadowski was the key decision-maker, not Heredia and McCoy. Doc. [102] at 5-6. That argument fails. As the person who monitored Plaintiff's ODP performance and reported to Sadowski that Plaintiff had failed his ODP, McCoy was closely involved in the decision-making process that led to Plaintiff's termination. *See King*, 517 F.3d at 1058 (direct evidence may include evidence of actions or discriminatory "comments 'uttered by individuals closely involved in employment decisions'" (quoting *Beshears*, 930 F.2d at 1358)). "[T]he fact that [McCoy] did not 'pull the trigger' is of little consequence." *Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir. 1994) (first alteration in original) (quoting *Simpson v. Diversitech Gen., Inc.*, 945 F.2d 156, 160 (6th Cir. 1991)). And Sadowski's August 29, 2018, Notification of Unacceptable Performance and November 8, 2018, Proposed Removal Notice, which incorporated language from McCoy's written reviews and ODP summary and adopted his findings, demonstrate that Sadowski relied on McCoy's assessment of Plaintiff's ODP performance in making the decision to terminate him, and Defendant admits as much. *See Gagnon*, 284 F.3d at 848; Doc. [102] at 5 ("McCoy's 30-Day ODP Reviews and ODP Summary were informative for Sadowski to make his decision of how to proceed as a result of Pujji failing his ODP."). There is also competent record evidence contradicting Heredia's assertion that he was not involved in the decision-making process. *See* Doc. [82-3] at 15 (Fry testifying that "Mr. Heredia, working with Mr. Sadowski," made the ultimate decision to issue the notice of proposed removal to Plaintiff).

Finally, Defendant urge that the comments of McCoy and Heredia should not be considered direct evidence of their discriminatory attitudes because McCoy testified that his "Indian English" comment was not an ethnic slur and Heredia testified that he was merely asking a question about whether Plaintiff's turban would have an effect on his tumor. Doc. [102] at 4, 6; Doc. [82-4] at 17; Doc. [82-6] at 19. While there may be more than one possible reasonable inference from McCoy and Heredia's comments, this Court is "not authorized to determine

15

which reasonable inference is most likely.  A jury is." *Liberal R-II Sch. Dist.*, 314 F.3d at 924; *see Carmody*, 713 F.3d at 404.

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court finds that the discriminatory statements of Heredia and McCoy are sufficient to permit a reasonable factfinder to find that discriminatory animus was more likely than not a motivating factor in the Defendant's decision to terminate Plaintiff.[13]  Therefore, the *Price Waterhouse* standard applies to Defendant's Title VII discrimination claims, not *McDonnell Douglas*, and the claims survive summary judgment.  *See Liberal R-II Sch. Dist.*, 314 F.3d at 926; *Griffith*, 387 F.3d at 736.

## II.    Title VII Retaliation

"Title VII prohibits employers from retaliating against employees for engaging in two broad categories of protected activity:  1) opposing any discrimination made unlawful by Title VII or 2) making a charge or participating in any manner in an investigation or proceeding under Title VII." *Bogren v. Minnesota*, 236 F.3d 399, 407-08 (8th Cir. 2000) (citing 42 U.S.C. § 2000e-3(a) (1994)).  "To defeat summary judgment, a plaintiff must produce either direct evidence of discrimination or create an inference of it under the *McDonnell Douglas* burden-shifting framework." *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011).  Plaintiff has not produced direct evidence of retaliation; the Court therefore analyzes his retaliation claim within the *McDonnell Douglas* framework.

"The elements of a retaliation claim under . . . Title VII are (1) protected activity, (2) subsequent adverse employment action, and (3) a causal relationship between the two." *Kim*

---

[13] In finding the evidence relating to Heredia and McCoy sufficient to defeat summary judgment, the Court takes no position on the relevance or weight of any other evidence Plaintiff cites in support of his discrimination claim.  *See, e.g.*, Doc. [90-24] at 2-3 (King stating that "management was out to get" Plaintiff ever since he notified management about the anonymous letter and that "Mr. Sadowski did everything he could to get rid of Mr. Pujji; it was a 'witch hunt'"); Doc. [90-25] at 3-4 (Linenweber characterizing Sadowski's attempt to terminate Plaintiff for conduct that was routinely permitted and encouraged by the FAA as "a prima facie case of discrimination"); Doc. [90-19] at 13 ("Per Lawrence Sadowski and concurred by Rhonda Frazier, Management and Program Analyst, no other employees have been terminated for the same or similar charges by Mr. Sadowski."); Doc. [90-24] at 4 ("Management used Mr. Pujji's performance as a reason for his termination. . . . , this was not reasonable. Mr. Pujji had great performance."); Doc. [82-5] at 29-30 (Sadowski stating in his deposition that he did not discipline G.R. for mistakes such as typographical errors and omitting necessary information); Doc. [88-4] at 15 (G.R.'s May 16, 2017, Logbook entry containing multiple typographical errors and failing to include necessary information regarding the aircraft's weight); Doc. [88-5] at 2 (G.R.'s October 20, 2017, report containing multiple typographical errors).

16

*v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (citing *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 704 (8th Cir. 1994)). Following the *McDonnell Douglas* framework, 411 U.S. 792 (1973), "[i]f an employee establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its action." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011). "[I]f the employer does so, the burden then shifts back to the employee to put forth evidence of pretext, 'the ultimate question being whether a prohibited reason, rather than the proffered reason, actually motivated the employer's action.'" *Id.* (quoting *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077-78 (8th Cir. 2010)). "An employee can prove that [his] employer's articulated justification for an adverse employment action is pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (alteration in original) (quoting *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1046 (8th Cir. 2010)).

The first question with respect to retaliation, then, is whether Plaintiff has made a prima facie case of: "(1) protected activity, (2) subsequent adverse employment action, and (3) a causal relationship between the two." *Kim*, 123 F.3d at 1060. Plaintiff easily satisfies the first element: He engaged in protected conduct by filing his December 1, 2017, discrimination complaint and participating in the February 2, 2018, mediation related to that complaint. *See Pye*, 641 F.3d at 1020 ("[Plaintiff]'s filing of the internal discrimination complaint qualifies as protected conduct." (citing *Helton v. Southland Racing Corp.*, 600 F.3d 954, 961 (8th Cir. 2010))); *Bogren*, 236 F.3d at 407-08 (participating in any manner in an investigation or proceeding under Title VII is a protected activity) (citing 42 U.S.C. § 2000e-3(a))).

The second element of Plaintiff's prima facie case is a "subsequent adverse employment action." *Kim*, 123 F.3d at 1060. The Eighth Circuit has described "an adverse employment action" as "a tangible change in working conditions that produces a material employment disadvantage." *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014) (quoting *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 955 (8th Cir. 2011)). "Each action claimed to be retaliatory must be sufficiently adverse to have created a material change in the employment, 'such as a change in salary, benefits, or responsibilities.'" *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1028 (8th Cir. 2004) (quoting *LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691 (8th Cir. 2001)). "Not everything that makes an employee unhappy

17

constitutes an actionable adverse employment action." *Id.* (citing *LaCroix*, 240 F.3d at 691). "A negative employment review, for example, is actionable only if the employer subsequently uses the evaluation as a basis to alter in a detrimental way the terms or conditions of the recipient's employment." *Id.* (citing *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000)); *see also Givens v. Cingular Wireless*, 396 F.3d 998 (8th Cir. 2005) (per curiam) (explaining that placing an employee on a "'performance improvement plan,' without more, d[oes] not constitute an adverse employment action." (citing *Henthorn*, 359 F.3d at 1028)).

The Supreme Court recently examined the Eighth Circuit's definition of "adverse employment action" in the Title VII discrimination context. *See Muldrow v. St. Louis*, 601 U.S. 346, 354 (2024). In *Muldrow*, the Supreme Court "obviated the requirement—replete in [Eighth Circuit] case law—that the claimed [adverse employment action] be 'significant,' 'material,' or 'serious.'" *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024) (citing *Muldrow*, 601 U.S. at 356 n. 2). "After *Muldrow*, [Plaintiff] is only required to plead 'some harm respecting an identifiable term or condition of employment.'" *Cole*, 105 F.4th at 1114 (quoting *Muldrow*, 601 U.S. at 354-55). This Court is not aware of any Supreme Court or Eighth Circuit precedent applying *Muldrow* to a Title VII retaliation claim. *See, e.g.*, *Collins v. Union Pac. R.R. Co.*, 108 F.4th 1049, 1053 (8th Cir. 2024) (returning discrimination and retaliation claims to the district court for reconsideration in light of *Muldrow*). But the Court need not decide whether *Muldrow* applies here, because Plaintiff successfully makes a prima facie case that he suffered an adverse employment action, either way.

Under *Muldrow*, Plaintiff easily makes a prima facie case that he suffered an adverse employment action. Viewing the evidence in the light most favorable to Plaintiff, he was denied the benefit of support staff's initial review during the ODP and was required to have weekly meetings with FLM McCoy, who used discriminatory language toward him and refused to help him improve his allegedly deficient performance, and the process culminated in his termination. Being placed on the ODP thus easily satisfies *Muldrow*'s "some harm" requirement. *See Muldrow*, 601 U.S. at 359 (plaintiff's allegations, if supported by evidence, met the "some harm" test "with room to spare," where she was transferred from a plainclothes prestigious division to a uniformed supervisory position, where she was less involved in high-visibility matters, primarily performed administrative work, and had a less regular schedule). And because Defendant used the ODP evaluation as a basis for terminating Plaintiff, being placed on the ODP also satisfies

18

the higher pre-*Muldrow* standard for an adverse employment action.  *See Wagner v. Campbell*, 779 F.3d 761, 767 (8th Cir. 2015) ("Lesser actions than demotion, suspension, and termination can be adverse employment actions if their cumulative effect causes an employee to suffer 'serious employment consequences' that adversely affect or undermine h[is] position." (quoting *Shockency v. Ramsey Cnty.*, 493 F.3d 941, 948 (8th Cir. 2007)); *Henthorn*, 359 F.3d at 1028 ("A negative employment review . . . is actionable only if the employer subsequently uses the evaluation as a basis to alter in a detrimental way the terms or conditions of the recipient's employment.").

Finally, Plaintiff satisfies the third element of his prima facie case by presenting sufficient evidence to permit a reasonable juror to infer a causal connection between his protected activity and being placed on an ODP.  "A plaintiff can establish a causal connection between statutorily protected activity and an adverse employment action through circumstantial evidence, such as the timing between the two events." *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir. 2004) (quoting *Jackson v. Flint Ink N. Am. Corp.*, 370 F.3d 791, 798 (8th Cir. 2004)).  "Temporal evidence should generally be corroborated by other evidence of employment discrimination." *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 963 (8th Cir. 2012) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)). Cases in which the Eighth Circuit has determined that "temporal proximity alone was sufficient to create an inference of the causal link 'have uniformly held that the temporal proximity must be very close.'" *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (quoting *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 859 (8th Cir. 2005)).  "Even if temporal proximity alone is insufficient to establish causation, the employee may attempt to prove causation by providing evidence of the employer's discriminatory comments." *Id*. (citing *Watson v. O'Neill*, 365 F.3d 609, 613 (8th Cir. 2004)).  "A pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement." *Id*. (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002)).

Although two months passed between the filing of Plaintiff's December 1, 2017, complaint and the February 1, 2018, meeting where Fry instructed Heredia and Sadowski to place Plaintiff on an ODP "as soon as possible," it is undisputed that the meeting took place the day before the mediation concerning Plaintiff's complaint; that Fry informed Plaintiff that he would be placed on an ODP during the mediation of his discrimination complaint; and that

Sadowski relayed Fry's instruction to place Plaintiff on an ODP to HR that same day.  Doc. [100] at 76-77.  The temporal proximity between Fry's instruction to place Plaintiff on an ODP and the mediation of his discrimination complaint is sufficient to create a genuine dispute as to a causal connection between the two.  *See Marez*, 688 F.3d at 963-64 (sufficient evidence of causal connection where less than 48 hours elapsed between the protected activity and the adverse employment action, and plaintiff presented evidence that defendant did not ordinarily terminate supervisors for the offenses listed in the termination letter); *Reifsteck v. Paco Bldg. Supply Co.*, 2005 WL 2674941, at *7 (E.D. Mo. Oct. 20, 2005) (allegations about defendant threatening to fire Plaintiff and telling her "don't bother coming back to work" during the mediation of her EEOC mediation were sufficient to raise a genuine issue of material fact as to whether there was a causal connection between the protected activity and the adverse employment action).  And in addition to the evidence of temporal proximity, Plaintiff's evidence of discriminatory animus in the decision-making process also supports a causal connection between protected activity and the ODP.  *See* Section I, *supra*; *Hite*, 446 F.3d at 866 ("Even if temporal proximity alone is insufficient to establish causation, the employee may attempt to prove causation by providing evidence of the employer's discriminatory comments."); *Marez*, 688 F.3d at 963 ("Temporal evidence should generally be corroborated by other evidence of employment discrimination.").

Despite having successfully made a prima facie case for retaliation, Plaintiff's retaliation claim still cannot survive summary judgment unless Plaintiff has produced enough evidence for a reasonable jury to find that Defendant's proffered non-discriminatory rationale for his adverse treatment was pretextual.  *Pye*, 641 F.3d at 1021.  Plaintiff clears that hurdle too.  The evidence that the timing of the ODP was inconsistent with the FAA's standard practice supports a finding of pretext.  *See* Doc. [100] at 77-78; *Hite*, 446 F.3d at 867 ("[T]he employee can prove pretext by showing that the employer varied from its normal policy or practice to address the employee's situation.") (citing *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir. 2001)).  So does the evidence that Sadowski issued the October 12, 2017, Proposed Removal Notice based on the 2016 flight review Plaintiff conducted for another aviator without compensation, which Defendant now admits was conduct encouraged by the FAA.  *See Marez*, 688 F.3d at 963-64; *Hite*, 446 F.3d at 867 (employee can prove pretext by showing that "the employer's proffered explanation has no basis in fact" and that "the employer routinely treated similarly situated employees who were not in the protected class more leniently"); Doc. [90-24] at 2-4; Doc. [100]

20

at 75.  Defendant's claim that the proposed removal was based on Plaintiff's failure to seek approval prior to conducting the flight review is not supported by the record.  The October 2017 Proposed Removal Notice cited only that Plaintiff conducted the June 2016 review, not that he lacked prior approval.  *See Elam v. Regions Fin. Corp.*, 601 F.3d 873, 881 (8th Cir. 2010) ("[S]ubstantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext."); Doc. [82-17] at 1-3.

Given the evidence suggesting that the stated reason for Plaintiff's proposed removal was pretextual and that Sadowski reduced the proposed removal to a 30-day suspension after a co-worker asked Regional Administrator Miniace to intervene on Plaintiff's behalf, a jury could reasonably infer that Fry instructed Heredia and Sadowski to place Plaintiff on an ODP the day before the mediation in an effort to paper Plaintiff's file to justify his termination.  *See Bainbridge*, 378 F.3d at 761 (a reasonable jury could infer that defendant "tried to paper [plaintiff]'s file to justify his termination" where a temporal proximity of six days coupled with Plaintiff's lack of an extensive disciplinary record, lack of changes in his job title, and consistent raises during his employment indicating satisfactory performance).  Fry's statement during the mediation that Plaintiff would be placed on an ODP and his March 8, 2018, email, which was sent one week before Sadowski gave Plaintiff the ODP letter pursuant to Fry's instruction, provide additional support for such an inference.  *See Kim*, 123 F.3d at 1061 (papering an employee's file with negative reports and written reprimands, coupled with lowered performance evaluations and special remedial training, may support a claim of retaliation where they adversely affect or undermine an employee's position); Doc. [100] at 22-24, 77.  A jury could also reasonably infer that the November 8, 2018, Proposed Removal Notice, issued three weeks after Fry was notified that Plaintiff had filed another internal complaint alleging that the August 29th Notification of Unacceptable Performance was discriminatory, was part of a pattern of adverse actions Defendant took against Plaintiff in retaliation for protected activities.  *See Hite*, 446 F.3d at 866.  Plaintiff has thus produced sufficient evidence to defeat summary judgment on his retaliation claim.  *See Young-Losee*, 631 F.3d at 912.

## III.   <u>Hostile Work Environment</u>

"To sustain a claim for harassment/hostile work environment, a plaintiff must show that he 'is a member of a protected group, that there was unwelcome harassment, that there was a causal nexus between the harassment and membership in the protected group, and that the

harassment affected a term, condition, or privilege of employment.'" *Pye*, 641 F.3d at 1018 (quoting *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942 (8th Cir. 2010)). "If the harassment comes from non-supervisory employees, the plaintiff must also show that the employer knew or should have known about the harassment but failed to take proper action." *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 794-95 (8th Cir. 2004) (citing *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 566 & n.5 (8th Cir. 2000)).

"To prevail, [Plaintiff] 'must show both that the offending conduct created an objectively hostile work environment and that []he subjectively perceived h[is] working conditions as abusive.'" *Bowen v. Mo. Dep't of Soc. Servs.*, 311 F.3d 878, 883 (8th Cir. 2002) (quoting *Williams v. City of Kansas City*, 223 F.3d 749, 753 (8th Cir. 2000)); *see also Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 578 (8th Cir. 1999) ("The same standards are generally used to evaluate claims of hostile work environment based upon sexual harassment and racial harassment."). Harassment that is "severe or pervasive is deemed to alter a term, condition, or privilege of employment." *Bowen*, 311 F.3d at 883 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)).

"[E]vidence of a hostile environment must not be compartmentalized, but must instead be based on the totality of circumstances of the entire hostile work environment." *Gillming v. Simmons Indus.*, 91 F.3d 1168, 1172 (8th Cir. 1996) (citing *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 599, 564 (8th Cir. 1992)). Such circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[A] court should consider the effect of the misconduct on the victim's psychological well-being in determining whether the victim subjectively perceived the environment to be hostile or abusive." *Bowen*, 311 F.3d at 884-85 (citing *Harris*, 510 U.S. at 23). But "no single factor is required." *Harris*, 510 U.S. at 23. "[H]arassment need not be so extreme that it produces tangible effects on job performance or psychological well-being to be actionable." *Bowen*, 311 F.3d at 885 (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999)).

In support of summary judgment, Defendant argues that Plaintiff cannot make a submissible case that the harassment was sufficiently severe and pervasive to create a hostile work environment. Defendant asserts, without citation, that "[t]he only issue that could possibly

22

fall into the category of harassment/hostile work environment would be when non-supervisory employees made reference, in a joking manner, to Pujji's turban . . . ." Doc. [84] at 20; *see generally id.* at 19-22.[14]  And while Defendant admits that there were three documented instances of FAA employees making inappropriate comments about Plaintiff's turban, he points out that none of the three documented incidents involved the term "turbine time," and that Sadowski testified that he had not heard the term used in reference to Plaintiff.  Doc. [102] at 19-20.  And Defendant maintains that no reasonable juror could believe Pujji's testimony that he was subjected to daily harassment from co-workers for years without complaining about it to anyone at the FAA.  *Id.* at 19.

Plaintiff's testimony about non-supervisory employees' comments is not the only evidence in the record that supports his hostile work environment claim.  The direct evidence that more than one supervisor made discriminatory remarks to or about him is also relevant to the totality of Plaintiff's circumstances.  *See, e.g.*, Doc. [88-3]; Doc. [82-6] at 18.  So is the evidence that, more than once, a supervisor who had made discriminatory remarks about Plaintiff was given authority over him.  *See* Doc. [82-3] at 8-9; Doc. [82-5] at 37; Doc. [82-41] at 1.  And so is the evidence that, despite being notified of the discriminatory conduct of certain supervisors, management still allowed them to exercise influence in the decision to terminate him.  *See* Doc. [82-3] at 8-9, 11, 15.  The conduct of supervisors is not irrelevant to a hostile work environment claim.  *See Delph v. Dr. Pepper Bottling Co of Paragould, Inc.*, 130 F.3d 349, 356 (8th Cir. 1997) ("on many (if not most) of the occasions recounted in the evidence, it was [Plaintiff]'s immediate supervisor[s] or the most senior employee in the . . . office who made the offensive comments").[15]

---

[14] Defendant does not mention the alleged discriminatory statements by supervisors in connection with Plaintiff's hostile work environment claim, except to note in his reply brief that Heredia's comment about Plaintiff's turban being the cause of his tumor did not mention "turbine time" and that Heredia received a 10-day suspension for the comment.  Doc. [102] at 19-20.

[15] As in *Delph*, a reasonable jury reviewing the record in this case could find that the three "supervisors were primarily responsible for creating and maintaining the racially hostile atmosphere at [the St. Louis FSDO]."  130 F.3d at 356.  "This also explains, and in this case excuses, [Plaintiff]'s failure to complain about the harassment to his supervisors."  *Id.* at 356 n.5 (citing *Briones v. Runyon*, 101 F.3d 287, 291-92 (2d Cir. 1996)).  "There would be little point in going to one's supervisors to challenge the racial atmosphere when it is those same supervisors who are creating and perpetuating it."  *Id.*

On top of the evidence of his supervisors' statements and actions, Plaintiff himself testified that his co-workers regularly called him derogatory names such as "turban head," Doc. [82-2] at 9-10; that they joked about gaining "turban time" by flying with him "[a]ll the time" throughout his time with the FAA, *id*. at 38-39; Doc. [82-1] at 27; and that they made jokes and comments related to his turban in front of FLM Sadowski multiple times, Doc. [82-2] at 39. Defendant urges the Court to reject Plaintiff's "self-serving" testimony about how frequently co-workers made harassing jokes and comments about his turban, but doing so would require this Court to engage in credibility determinations that are impermissible at the summary judgment stage. *See Torgerson*, 643 F.3d at 1042.

Certain other aspects of the record also lend weight to Plaintiff's hostile work environment claim. For example, as in *Delph*, "this is not a situation where racial jokes and innuendo were merely bandied about the workplace with no particular target, or where [Plaintiff] was called names behind his back but was unaware of it." 130 F.3d at 356. Plaintiff has produced evidence that discriminatory remarks were made in his presence and directed at him, often in the presence of others, and sometimes in the presence of supervisors. *See Watson*, 619 F.3d at 943 (other considerations enhanced the severity of the slurs and harassing comments, including that they were directed at plaintiffs in their presence and the presence of co-workers and supervisors); *see, e.g.*, Doc. [82-6] at 18; Doc. [88-3] at 2; Doc. [90-10]; Doc. [90-12] at 2; Doc. [90-24] at 2-3. Also, as in *Watson*, "some of the comments were made in a manner that a jury could reasonably conclude would be particularly demeaning or humiliating" to Plaintiff. *See* 619 F.3d at 943. For example, one comment about Plaintiff's turban was made out loud in an office-wide meeting, with no corrective response. *See* Doc. [90-12] at 2. Also, with respect to at least that incident and the anonymous letter, there is evidence "that the employer knew or should have known about the harassment but failed to take proper action." *Williams*, 378 F.3d at 794-95; *see, e.g.*, Doc. [90-24] at 2-3 (King's testimony that, after Plaintiff reported the anonymous letter referring to him in derogatory terms, "[n]othing came of this except . . . management was out to get him.").

The record thus includes evidence that both supervisors and co-workers made derogatory and discriminatory comments about Plaintiff—sometimes directly to him, sometimes in the presence of others, and sometimes under humiliating circumstances—over a span of years, and that at least some such incidents were insufficiently addressed by FAA leadership. That is

enough to get Plaintiff's hostile work environment claim in front of a jury.  *E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 687 (8th Cir. 2012) ("Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury.") (quoting *Sheriff v. Midwest Health Partners, P.C.*, 619 F.3d 923, 931 (8th Cir. 2010)).

CONCLUSION

Viewing the record in the light most favorable to Plaintiff, the Court finds that there are genuine disputes of material fact as to all of his claims.  *See Celotex Corp.*, 477 U.S. at 323. Because "reasonable minds could differ as to the import of the evidence," summary judgment is denied.  *Quick*, 90 F.3d at 1377.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, Doc. [80], is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File Under Seal, Doc. [94], is **GRANTED**.

**IT IS FINALLY ORDERED** that the parties must complete alternative dispute resolution no later than **March 17, 2025**.  A separate order referring the case to alternative dispute resolution will issue.

A separate Judgment will accompany this Memorandum and Order.

Dated this 29th day of January, 2025.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE